Filed 10/21/13  Marriage of DeRosa CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of JENNIFER A. and THOMAS J. DeROSA. | |
| | D061906 |
| JENNIFER A. DeROSA, | |
| Respondent, | (Super. Ct. No. D514565) |
| v. | |
| THOMAS J. DeROSA, | |
| Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Edlene C. McKenzie, Commissioner.  Affirmed.

Law Office of Anthony J. Boucek and Anthony J. Boucek for Appellant.

No appearance for Respondent.

Thomas J. DeRosa appeals from an order denying his second motion to modify his spousal and child support obligations to his former wife, Jennifer A. DeRosa, which he brought four months after the court denied his first motion to modify support.  Following

three days of hearings, during which both Thomas[1] and Jennifer testified, the court found that Thomas's motion was "based upon the same facts and circumstances" upon which his first motion was based and, thus, Thomas had failed to meet his burden of showing a change of circumstances.

Thomas asserts six principal claims of error. Specifically, he contends the court abused its discretion (1) in finding there was no change in circumstances regarding his income after the court denied his first motion to modify support; (2) in determining the amount of Thomas's income; (3) in finding that Thomas's monthly gross earning capacity continued to be $21,833 and in imputing such income to Thomas without making any finding he had an available opportunity to earn such income; (4) in calculating child support arrears; (5) in finding that the gross monthly proceeds from Thomas's sale of a software module totaled $20,800; and (6) in imposing sanctions and attorney fees.

Jennifer has not responded to this appeal.

We affirm the order denying Thomas's second motion to modify support.

FACTUAL AND PROCEDURAL BACKGROUND

Thomas and Jennifer were married in mid-2000 and separated in 2009 after a marriage of eight years seven months. They have three minor children.

Jennifer filed her petition for dissolution in February 2009. At that time, Thomas was chief executive officer (CEO) and the majority shareholder of ezGDS, an Internet airline travel business that used a software program (the software module) Thomas

---

[1] We will refer to the parties by their first names for clarity and convenience only. We intend no disrespect.

2

developed during the marriage.  Although Jennifer had occasionally worked as a substitute teacher during the marriage, she primarily stayed home to care for the children.

A.  *Temporary Support Orders*

In early May 2009, the court[2] issued temporary child and spousal support orders. Finding that Thomas's gross monthly income was $21,833 and Jennifer had no income, the court ordered Thomas to pay monthly child support in the amount of $5,078.  In lieu of spousal support, the court ordered that Jennifer have temporary exclusive possession and use of the family residence and that Thomas pay all expenses associated with the residence.  The court adopted the parties' family court services agreement, which provided that the children would primarily reside with Jennifer.

B.  *Stipulation for the Entry of Judgment*

On August 19, 2010, Thomas and Jennifer entered into a negotiated global settlement of all issues, which was memorialized in a stipulation for the entry of judgment (Stipulation) that Thomas signed on that date.  Jennifer signed the Stipulation about three months later on November 29, the day before Thomas filed his first motion to modify his support obligations (discussed, *post*).

As pertinent here, the Stipulation provided that Thomas would continue paying monthly child support in the amount of $5,078 and that in lieu of spousal support Jennifer would continue to have exclusive possession and use of the family residence—and Thomas would continue to pay all expenses associated with the residence—until June 1,

---

2  The Honorable Edward P. Allard III.

3

2011 (or a later date agreed to by the parties), at which time Jennifer would vacate the residence and Thomas would pay monthly spousal support and child support in specified amounts.

In addition, the Stipulation provided that Thomas "shall indemnify Jennifer and hold her harmless from any and all liabilities related to [ezGDS], including but not limited to any liabilities arising out of litigation or bankruptcy proceedings."

With respect to the software module, the Stipulation memorialized the parties' agreement that (1) although the software module was Thomas's separate property, "the community has an interest" in it; (2) Thomas would "use good faith efforts to sell the software module for the highest available price"; and (3) Jennifer was "entitled to receive 50[ percent] of the *net* sale proceeds, up to a maximum of $275,000" (italics added).

The Stipulation provided that Thomas would pay to Jennifer the sum of $15,000 as his contribution toward her attorney fees and costs, and he was responsible for payment of his own attorney fees and costs.

The Stipulation also memorialized the parties' anticipation that a marital settlement agreement reflecting the agreements would be prepared and "entered as part of the judgment in this case," but that "if a Marital Settlement Agreement cannot be reached, this stipulation may be entered as the Judgment of Dissolution pursuant to Code of Civil Procedure [section] 664.6."

4

C.  *Thomas's Sale of the Software Module*:

Effective October 22, 2010—about five weeks before he filed his first motion to modify his support obligations on November 30—Thomas sold the software module to LBF Travel, Inc. (LBF Travel).

To effectuate the sale, Thomas and LBF Travel entered into two agreements:  (1) an asset purchase agreement (APA); and (2) a consulting services agreement (CSA), under which Thomas agreed to work for LBF Travel for a period of time as a consultant.

1.  *The APA*

a. *Purchase price and conditional minimum cash consideration ($20,800 per month)*

Section 2.4 of the APA provided that LBF Travel agreed to pay Thomas a cash consideration and issue to him a stock consideration.[3]  Subdivision (a) of section 2.4 defined the cash consideration as "up to $1,250,000 in cash . . . as follows:"  (1) the sum of $499,200 (denominated the minimum cash consideration), which LBF Travel would pay to Thomas in 24 "equal monthly installments of $20,800 each," commencing 30 days after the closing date; plus (2) $750,800 (denominated the earn-out consideration), which LBF Travel would pay to Thomas in quarterly earn-out payment installments in the amount of 25 percent of LBF Travel's "Net Income for the prior full fiscal quarter," commencing with the first full fiscal quarter following the closing date.

---

3      The stock consideration is not at issue in this appeal.

b. *Adjustments to purchase price*

Of particular importance in this appeal, section 2.5 of the APA provided that, if Thomas quit or LBF Travel terminated his consulting services with or without cause prior to the end of the specified consulting period, the conditional monthly installment of $20,800 "for each full month remaining in the Consulting Period at the time of such termination *shall be reduced by [$10,000] . . . .*"  (Italics added.)

2. *The CSA and the agreed-upon full consideration for Thomas's consulting services*

Under the CSA, which expressly referred to the APA, LBF Travel retained Thomas as a consultant and independent contractor, and Thomas was "expected to devote a reasonable amount of time" providing consultant services for a period of two years beginning on October 22, 2010.

The CSA expressly provided that Thomas's retention was "non-exclusive and [he] shall be permitted to perform consulting services for other parties provided that such services [do] not violate the non-competition provisions set forth in Section 6.14 of the [APA]."

a. *Section 6 and exhibit B (full consideration for Thomas's consulting)*

Section 6 of the CSA, which explicitly addressed the full consideration and compensation LBF Travel owed Thomas for his consulting services, provided:

> "As *full consideration* for the Services rendered by [Thomas] pursuant to this Agreement, [*LBF Travel*] *shall pay* [*Thomas*] *the compensation as described in* Exhibit B.  All fees for the Services shall be paid without any deduction including, without limitation, any deduction for social security, federal or state or withholding taxes or unemployment insurance.  [Thomas] acknowledges that he

6

is responsible for the proper reporting and payment of all taxes on such fees."  (Italics added.)

As pertinent here, exhibit B to the CSA provided that Thomas was entitled to receive—as full consideration for his consulting services —100 percent of the hosting fees and ticketing fees received by LBF Travel, up to $230,000 per year, plus 50 percent of any hosting fees and ticketing fees received in excess of $230,000 during the same year.

D.  *ezGDS's ABC and the Assignee/Trustee's Termination of Thomas's Employment as ezGDS's CEO*

Five days after he entered into the APA and CSA and sold the software module—Thomas decided to dissolve ezGDS and terminate his employment as ezGDS's CEO.  On that date, Thomas signed an ABC, whereby ezGDS, as the assignor, assigned all of its assets to Leslie Gladstone doing business as Financial Law Group (Gladstone) in trust for the benefit of ezGDS's creditors.[4]  On that same date Gladstone terminated all of ezGDS's operations as well as Thomas's employment as its CEO and his monthly gross income of $21,833.

---

[4]  Gladstone's June 22, 2011 declaration defines an ABC as "a formal insolvency status under California law by which an entity (such as ezGDS) ceases to operate and all employee's employment therewith is terminated."  Gladstone stated that an ABC assignee has "an affirmative duty to liquidate and make distributions to all creditors on a prorated payment plan."

7

E. *Thomas's First Motion To Modify His Support Obligations, and Jennifer's Motion To Have the Stipulation Entered as the Judgment*

1. *Thomas's motion to modify support claiming his monthly income was $0*

On November 30, 2010—about a month after he signed the ABC that immediately resulted in the termination of his employment as ezGDS's CEO—Thomas filed in propria persona his first motion to modify his child support and spousal support obligations.

In his supporting declaration, Thomas stated his circumstances had changed when ezGDS filed the ABC, resulting in the loss of his job and the termination of his salary and benefits. He also stated that as a result of this "change of circumstances," his "current income [was] $0 per month." Thomas requested that the court reduce to zero his monthly obligations for both child support and spousal support. He did not mention the sale of his software module to LBF Travel, the APA, or the CSA.

In his separate income and expense declaration, Thomas stated that his employer had filed an ABC and his position was terminated on October 27, 2010.

2. *Jennifer's opposition and her companion motion to have the parties' Stipulation entered as the judgment*

Jennifer thereafter filed her responsive declaration opposing Thomas's motion to modify support, in which she informed the court that Thomas had "liquidate[d] our community property business, ezGDS" by entering into the ABC, thereby terminating his own employment, and that Thomas was "not unemployed, as he represent[ed] in his pleadings" because he had entered into the APA and CSA and had sold the software module, which had "retained [him] as a consultant."

8

In a companion motion set forth in her declaration, Jennifer requested that the Stipulation be entered as the judgment under Code of Civil Procedure section 664.6, as provided in the Stipulation (a copy of which she lodged as an exhibit), and that their marital status be terminated. She stated that Thomas had not paid child support since October 2010, and he owed $12,695 in child support arrears. She also stated that Thomas had agreed in the Stipulation to pay $15,000 towards her attorney fees and costs, but "to date [he] ha[d] never made or been ordered to make a contribution to [her] attorney[] fees." Jennifer requested that the court order Thomas to "pay the child support due and owing for November 2010, December 2010 and January 2011" and to "make a contribution toward [her] attorney[] fees and costs."

3. *January 2011 hearing and rulings*

At the January 24, 2011 hearing on Thomas's motion to modify support and Jennifer's motion to have the Stipulation entered as the judgment under Code of Civil Procedure section 664.6, Jennifer was present with her counsel. Thomas, who was *not* present, was also represented by counsel.

a. *Jennifer's motion for entry of the Stipulation as the judgment*

The court[5] first granted Jennifer's motion for entry of the Stipulation as the judgment, finding that the Stipulation "appear[ed] to be a complete resolution of the parties' assets and obligations towards each other and toward their children" and ruling that "the agreement of the parties is entered per their stipulation." The court observed

---

5       The Honorable Susan P. Marrinan.

9

that Thomas "did act upon the [Stipulation] with the sale of this [software module] asset, so he can hardly come into court and say I can act on it but nobody else can." The court directed Jennifer to "prepare the rest of the judgment to attach thereto."[6]

b. *Thomas's motion to modify support and his request for a Gavron[7] warning*

Addressing next Thomas's motion to modify child support and spousal support, the court found that the parties' Stipulation "appear[ed] to control" and that "[Thomas's] change of circumstances predate[d] today." Observing that Thomas "filed [in propria persona] an income and expense declaration on . . . November 30, 2010," the court found that "[n]owhere *in that income and expense declaration does he reference the* [*APA*], which certainly would have some bearing on his assets, at the very least" (italics added). The court found Thomas's income and expense declaration was, "on its face, inaccurate," observing that if Thomas "were here, he could testify as to why he might have neglected to mention" the sale of the software module.

The court denied Thomas's motion to modify his support obligations and noted that Thomas was "asking the court to modify previous spousal support and child support based on an inaccurate income and expense declaration." The court added that this "cause[d] the court to wonder about his declaration, the change of circumstances where he lost his job, particularly if he terminated his own company." The court found "[t]here

---

6    The record shows and Thomas acknowledges on appeal that the Stipulation was entered as the judgment on May 18, 2011, one week after Thomas filed his second motion to modify support (discussed, *post*).

7    *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705.

[was] no evidence of unemployment benefits," noting that "[i]f a person gets fired, they can get unemployment benefits," but "[i]f they fire themselves, they probably can't, but we don't have any evidence of that, no documentary evidence."  Noting also that Thomas was claiming he had $12,534 in monthly expenses and this was "a bit high for someone who has no income," the court stated, "I don't think he carried his burden of proof in that regard regarding the circumstances which now find him to be without income."

The court granted Thomas's request for a *Gavron* warning, but stated, "I'll make it to both of these parties."  The court explained that, as a matter of public policy, the courts in California "expect both parties to be self-supporting within a reasonable period of time."  The court admonished Thomas and Jennifer that "[t]hey both appear to be intelligent, capable, talented people, and the court sees no reason why they can't be self-supporting at some reasonable time in the future.  There is your *Gavron* warning."[8]  The court ordered both parties to make 10 job contacts per week.

c.  *Attorney fees and child support arrears*

Regarding attorney fees, the court ruled that "each party pay their own since they both have assets now to do it."

The court ordered Thomas to pay child support arrears in the total amount of $15,234, based on the monthly rate of $5,078 as set forth in the Stipulation.

---

8      The court's findings and order after hearing contained the following *Gavron* warning:  "Pursuant to *In re Marriage of Gavron*, both parties are advised as followed:  *It is the goal of this state that each party will make reasonable good faith efforts to become self-supporting as provided for in Family Code Section 4320.  The failure to make reasonable good faith efforts may be one of the factors considered by the court as a basis for modifying or terminating spousal or partner support.*"

F.  *Thomas's Second Motion To Modify His Support Obligations*

On May 11, 2011, less than four months after the court denied his first motion to modify support (discussed, *ante*), Thomas filed his second motion for modification of child and spousal support, which is the subject of this appeal.

1.  *Thomas's supporting declaration*

As pertinent here, Thomas asserted in his supporting declaration that "there has been a significant change of circumstances meriting a modification of child and spousal support" and requested that child support be reduced from $5,078 per month to guideline support of $1,220 per month and that spousal support be reduced to $167 per month.  He stated that when he signed the Stipulation in August 2010 and agreed to pay monthly child support in the amount of $5,078, he then was earning $20,833[9] per month, and Jennifer had no income.  Thomas asserted that circumstances significantly changed between August 2010 and November 2010, when Jennifer signed the Stipulation, in that "[his] company ezGDS went broke," he "looked into bankruptcy," he met with his attorneys, and "it was determined the best thing for the company to do was an Assignment for Benefit of Creditors [(ABC)]."  Thomas asserted that ezGDS was insolvent when it made the ABC on October 27, 2010, and it "had insufficient funds to pay any of its employees including, but not limited to, me."  He stated that on that date,

---

9     In his reply declaration filed on June 22, 2011, Thomas stated that when he was employed by ezGDS in 2009, he was "earning $21,833.00 per month in income."

12

Gladstone, the trustee and assignee of the ABC, "terminated all operations and all employees, including, but not limited to, me."

Thomas also stated that he sold the software module by executing the APA and CSA, under which he "sold the software to [LBF Travel] in an incremental basis and with an agreement to work for the company for a period of time as a consultant, which employment included a salary to me." Thomas recounted the terms of the purchase price set forth in section 2.4 of the APA,[10] as well as the terms of section 2.5 of the APA, which provided that, if Thomas quit or LBF Travel terminated his consulting services with or without cause prior to the end of the specified consulting period, the monthly installment of $20,800 "for each full month remaining in the Consulting Period at the time of such termination *shall be reduced by* [*$10,000*] . . . ." (italics added).

In his declaration, Thomas also stated that (1) he was "contractually obligated to work for [LBF Travel] at the rate of $10,000.00 per month for 24 months"; (2) this $10,000 per month in "self-employment income" was "income available for child and spousal support"; (3) his monthly work-related expenses were $3,777, leaving him with monthly self-employment income of $6,223; (4) Jennifer was entitled under the Stipulation to receive 50 percent of the net sales proceeds from the sale of the software

---

10     In the interest of clarity, we reiterate that section 2.4 of the APA provided that LBF Travel agreed to pay Thomas a cash consideration of "up to $1,250,000 in cash . . . as follows": (1) the sum of $499,200 in 24 "equal monthly installments of $20,800 each," commencing 30 days after the closing date; plus (2) $750,800 in quarterly earn-out payment installments in the amount of 25 percent of LBF Travel's "[n]et [i]ncome for the prior full fiscal quarter," commencing with the first full fiscal quarter following the closing date.

module, up to a maximum of $275,000, which Thomas calculated to be $3,796 per month; and (5) he had paid Jennifer $2,852 in excess of the amount of net sales proceeds she was entitled to receive.

Thomas denied Jennifer's claim that he owed $15,234 in child support arrears and asserted he had overpaid child support by $997 as of January 31, 2011.

In his summary, Thomas requested modification of the current order for child support and spousal support based on "the significant change of circumstances regarding [his] income, the insolvency of [his] company, the sale of the software, [his] obligated full-time consulting employment contract with [LBF Travel], [Jennifer's] receipt of one-half of the sales proceeds from the software, [her] *Gavron* warning, [her] failure to comply with the court order regarding job contacts, and [her] ability to earn."

In his motion, Thomas requested an award of attorney fees in an amount exceeding $40,000. He also requested an award of sanctions.

In his income and expense declaration, Thomas asserted his average monthly income from self-employment as a consultant for LBF Travel was $6,222.

a. *Other supporting declarations*

In support of his second motion to modify support, Thomas submitted the declaration of Ray Gallagher, a certified public accountant. Based on the provisions of the APA, Gallagher stated that Thomas received $20,800 per month of which $10,000 is income for consulting services under his consulting agreement (i.e., the CSA). Gallagher opined that "[t]he remaining $10,800 would be characterized as capital gain income

14

related to the sale of the purchased assets." He also opined that Thomas "would incur a combined 25[ percent] federal and state tax rate on his net capital gain income."

Thomas also submitted the declaration of attorney Jeffry Davis, who stated that Gladstone was the assignee of ezGDS's ABC and an assignee or trustee for an ABC "has an affirmative duty to liquidate assets and make distributions of the proceeds to all creditors on a prorated payment plan."

In addition, Thomas submitted the declaration of Gladstone, who stated that ezGDS was insolvent when it made the ABC on October 27, 2010. She also stated that "[w]hen ezGDS made the ABC, [she] terminated all operations and all employees, including, but not limited to, [Thomas]." Gladstone also asserted that pursuant to the ABC, Thomas "did not receive any cash, distributions, refunds, compensation owing, past due or deferred or any other monetary or property award resulting from the liquidation"; and "[Thomas's] salary and all other rights to compensation were permanently terminated effective 10/27/10, and he has received nothing from ezGDS or from me, as the trustee, since said time."

2. *Jennifer's responsive declaration*

In her responsive declaration, Jennifer asserted that Thomas's new motion to modify support was based on "the same set of 'changed' circumstances" that was the basis of his first motion to modify support, which the court denied. Jennifer reminded the court that in his first motion to modify support Thomas claimed he was unemployed and earned zero income. She stated the court had ordered Thomas to pay her monthly child support in the amount of $5,078, but he "has not made a single child support payment to

15

me since October 2010," and "[h]e owes me $40,624 in child support and $30,027 in property division payments, plus interest, to date," for a total of $70,651 plus interest. She acknowledged that in March, April and May 2011, Thomas paid her $8,766 each month, and he had not yet paid anything for June 2011. She also acknowledged that Thomas had made "partial payments of the software sale proceeds in November 2010 and since January 2011."

Jennifer also stated that "[b]ecause Thomas has refused to comply with the Court's orders regarding property division and support payments," she was financially unable to pay her attorneys. In a footnote, Jennifer asserted that "[her] total attorney[] fees incurred in this matter are $127,161.02, of which Thomas has paid nothing, despite being the sole-wage-earner in our marriage and the person who controlled all of our finances and assets." She asked the court to order Thomas "to make a contribution to [her] attorney[] fees and costs."

Supported by an attachment to her income and expense declaration, Jennifer stated she had "received minimal income from [her] part-time work organizing and filing records as an independent contractor, and from jewelry parties"; and she "ha[d] just started a commission-based job working for a magazine," but she had not yet received any income from this new position.

3. *Hearings on the two motions*

The court conducted three days of hearings on the parties' two motions and received testimony from both Thomas and Jennifer supporting the facts stated in their respective declarations. At the conclusion of the evidentiary phase of the proceeding,

16

Thomas and Jennifer presented their closing arguments through their respective attorneys.

4. *Order* (*final statement of decision*)

In March 2012, the court[11] issued its final statement of decision after it received and considered Thomas's objections to the court's original statement of decision. The court issued the following rulings:

i. *Spousal support*

Explaining that "[a] spousal support modification may be granted only if there has been a material change of circumstances since the most recent order," the court found Thomas had "[brought] his second motion to modify support four months after his motion to modify was heard and denied *based upon the same facts and circumstances*." (Italics added.) Specifically, the court found that in October 2010─*before* Thomas filed his first motion to modify support in November of that year─Thomas sold the software module to LBF Travel, he started his consulting services with LBF Travel, and he also started receiving the monthly $20,800 payments from LBF Travel.

The court also found Thomas was compensated as set forth in exhibit B to the CSA, which "sets forth the 'full consideration' for the consulting services rendered by [him]."

---

11    The Honorable Edlene C. McKenzie.

The court further found Thomas had a monthly "earning capacity of $21,833 per the court[']s findings of May 5, 2009"; and, in October 2010, he entered into the ABC and "liquidated the community business, effectively terminating his own job."

In addition, the court found that, at that time, Thomas also began negotiations to sell the software module to LBF Travel "for a considerable profit and to begin work as a consultant for [LBF Travel]." Thomas "negotiated a deal with [LBF Travel] that resulted in two contracts, [the APA] and [the CSA]," under which he "negotiated to receive up to $1,250,000 in cash for the sale of the software," and "chose to enter into a non-competition agreement which would prevent him from competing with LBF Travel for a period of two years."

Based on these findings, the court determined that "there has been no change of circumstances regarding [Thomas's] income since [his] last motion to modify support," which the court denied on January 24, 2011, "the date the court use[d] as a benchmark for determining a change of circumstance." The court found Thomas had "engineered his current earning capacity through decisions he made himself, first with the decision to liquidate the community business, then *his* decision to sell the software module he created during the marriage and finally *his* decision to negotiate a non-competition clause with LBF Travel." The court also found that "[Thomas's] earning capacity continues to be $21,833 per month", and he "has the ability to pay for the support of [Jennifer] at the current levels."

The court imputed to Jennifer an earning capacity of $2,253 per month for purposes of calculating child support and spousal support. The court then found that,

18

"[e]ven with this court imputing monthly income to [Jennifer] in the amount of $2,253, her modified child support payment of $4,911 combined with the spousal support provided in the Judgment of $4,481 (upon her vacating the residence) would not be sufficient to cover her monthly household expenses."

After making various other findings, the court denied Thomas's request for modification of "the existing spousal support order."

ii. *Monthly child support*

Based on Thomas's imputed gross monthly income of $21,833, his monthly property tax and mortgage deductions, Jennifer's imputed gross monthly income of $2,253, and other factors, the court reduced Thomas's monthly child support obligation from $5,078 to $4,911 effective June 1, 2011.

iii. *Child support arrears*

With respect to the issue of child support arrears, the court first noted it had previously determined that Thomas owed child support arrears in the amount of $15,234 for the period from November 2010 through January 2011. The court then found that from February 2011 through August 2011, Thomas had paid to Jennifer a total of $52,596.

Stating that "[t]he court applies [Thomas's] payments to [Jennifer] first to child support," the court then found Thomas owed Jennifer $4,911 in child support arrears from February 2011 through August 2011, plus $42,872 in property division arrears, for a total of $47,783.

19

Based on these findings, the court ordered Thomas to "pay child support arrears of $20,145 ($15,234 + $4,911)" at the rate of $1,500 per month, beginning on February 15, 2012.

iv. *Net monthly software module sale proceeds payable to Jennifer*

The court found that Thomas was receiving gross monthly software sales proceeds in the amount of $20,800, and he would incur a tax liability of 25 percent on those proceeds, resulting in a monthly *net* payment to him of $15,600. Pursuant to the judgment, the court ordered Thomas to pay to Jennifer "on a monthly basis [one-half] of the net sale proceeds or $7,800 per month."

v. *Attorney fees and sanctions*

The court ordered Thomas to pay $35,000 in attorney fees, costs and sanctions in monthly installments of $1,500 beginning on February 15, 2012. The court denied Thomas's request for attorney fees and sanctions.

G. *Thomas's Motion To Correct a Clerical Error in the Final Statement of Decision, and His Notice of Appeal*

Thomas thereafter brought a motion (discussed, *post*) under Code of Civil Procedure section 473, subdivision (d), to correct claimed "clerical, mathematical errors" in the March 2012 final statement of decision. The court denied the motion, and Thomas thereafter filed his notice of appeal.

20

DISCUSSION

## I.  *THE COURT'S FINDING OF NO CHANGE IN CIRCUMSTANCES REGARDING THOMAS'S INCOME*

Thomas asserts that in denying his second motion to modify spousal and child support, the court abused its discretion when it found "there has been no change of circumstances *regarding* [*Thomas's*] *income* since [his] last motion to modify support, [which the court] heard and denied January 24, 2011."  We reject this contention.

A.  *Applicable Legal Principles*

"Modification of spousal support . . . requires a *material change of circumstances since the last* [*spousal support*] *order*."  (*In re Marriage of McCann* (1996) 41 Cal.App.4th 978, 982, italics added; accord, *In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 396.)  Similarly, modification of child support requires a material change of circumstances *since the last child support order*.  (*In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1054.)

"Change of circumstances means a *reduction or increase in the supporting spouse's ability to pay* and/or an increase or decrease in the supported spouse's needs.  It includes all factors affecting need and the ability to pay."  (*In re Marriage of McCann*, *supra*, 41 Cal.App.4th at p. 982, italics added; accord, *In re Marriage of Dietz*, supra, 176 Cal.App.4th at p. 396.)

Appellate review of orders modifying spousal or child support is governed by an abuse of discretion standard.  (*In re Marriage of McCann*, *supra*, 41 Cal.App.4th at pp. 982-983; *In re Marriage of Cryer*, *supra*, 198 Cal.App.4th at p. 1054.)

21

B. *Analysis*

Thomas filed his second motion to modify support about four months after the court denied his first motion to modify support. Claiming "there ha[d] been a significant change of circumstances meriting a modification of child and spousal support," Thomas asked the court "to modify the child and spousal support ordered in the Judgment that was deemed to be entered on January 24, 2011," by reducing his monthly obligations for both types of support.

However, in support of his second motion to modify support, Thomas did *not* claim there had been a material change of circumstances affecting his income and ability to pay support *since the last child and spousal support orders* issued by the court, as he was required to do. (See *In re Marriage of McCann*, *supra*, 41 Cal.App.4th at p. 983; *In re Marriage of Cryer*, *supra*, 198 Cal.App.4th at p. 1054.) Rather, he asserted "there has been a significant change of circumstances *since I entered into the Stipulation for Entry of Judgment on August 19, 2010.*" Thomas then improperly detailed "circumstances [that] significantly change[d] between August and November 2010" and *predated* not only the January 2011 support orders, but also his *first* motion to modify child and spousal support, which he filed on November 30, 2010.

Specifically, as his claimed changes of circumstance affecting his income and ability to pay support, Thomas cited (1) his sale of his software module and the APA and CSA into which he entered to effectuate that sale; (2) his working as a consultant pursuant to the terms of the those agreements; (3) his monthly receipt of $20,800 in gross minimum cash consideration installments resulting from the sale of the software module;

22

and (4) the ABC liquidation of ezGDS, with the resulting termination of his position and his $20,833 gross monthly CEO salary.

For purposes of his second motion to modify support, *none* of these claimed changes of circumstance was a material change in circumstance affecting his income and ability to pay support because they all *predated* the last support orders issued by the court in January 2011 when it denied Thomas's first motion to modify support. Thus, we conclude Thomas's contention that the court abused its discretion when it found there had been "no change of circumstances regarding [his] income since [his] last motion to modify support" is without merit. The court properly found Thomas "[brought] his second motion to modify support four months after his motion to modify was heard and denied based upon the same facts and circumstances."

## II. *THE COURT'S DETERMINATION OF THOMAS'S INCOME AVAILABLE FOR SUPPORT*

Next, Thomas claims the court "abused its discretion in determining [his] income available for support." Specifically, he contends the court erroneously "found that the entirety of [his] true monthly cash flow" of $20,800 "reflected proceeds from the sale of the software module," and thereby "implicitly found that [he] had no income available for support." Thomas asserts that according to the express language of section 2.5 of the APA, $10,000 of the monthly $20,800 cash flow is "gross income from his consulting services for LBF Travel," and the remaining $10,800 is monthly gross proceeds from the sale of the software module. We conclude the court did not abuse its discretion.

23

Thomas is essentially claiming that, as a result of both his sale of the software module and the ABC proceeding that resulted in the liquidation of ezGDS and the termination of his position, his gross monthly income fell from $21,833 to $10,000, which he claims is the income he is now earning as a consultant to LBF Travel pursuant to Section 2.5 of the APA. As previously discussed, Section 2.5 of the APA provides that if Thomas quits or LBF Travel terminates his consulting services with or without cause prior to the end of the specified consulting period, the monthly minimum cash consideration installment of $20,800 "for each full month remaining in the Consulting Period at the time of such termination *shall be reduced by* [*$10,000*] . . . ." (Italics added.)

However, section 6 of the CSA, which explicitly addressed the full consideration and compensation LBF Travel owed Thomas for his consulting services, expressly provided in part:

> "As *full consideration* for the Services rendered by [Thomas] pursuant to this Agreement, [*LBF Travel*] *shall pay* [*Thomas*] *the compensation as described in* <u>Exhibit B</u>." (Italics added.)

Neither the foregoing provisions of section 6 of the CSA, nor those of any other section of either the CSA or the APA, expressly mentioned or referred to a monthly $10,000 salary as compensation for Thomas's consulting services. Thus, section 6 of the CSA, expressly governed Thomas's compensation and provided that that compensation was "described in <u>Exhibit B</u>."

As pertinent here, exhibit B to the CSA provided (as the court found) that Thomas was entitled to receive—as full consideration for his consulting services under Section 6

24

of the CSA—100 percent of the hosting fees and ticketing fees received by LBF Travel, up to $230,000 per year, plus 50 percent of any hosting fees and ticketing fees received in excess of $230,000 during the same year.

Thus, we conclude the court did not abuse its discretion because the plain express language of the foregoing contractual provisions support the court's finding that the $10,000 monthly payment in question was not Thomas's gross monthly income "available for support." For reasons we now discuss, the court properly imputed to Thomas the gross monthly income he had been earning before he sold the software module and instituted the ABC proceedings that resulted in the termination of his position.

### III. *THOMAS'S IMPUTED GROSS MONTHLY INCOME OF $21,833*

Thomas contends the court abused its discretion (1) in finding his earning capacity continued to be $21,833 and (2) in imputing such income "contrary to the evidence" without making any finding that he had an available opportunity to earn such income. We conclude the court did not abuse its discretion.

Noting that Thomas "effectively terminat[ed] his own job," the court found that Thomas "engineered his current earning capacity through decisions he made himself" and that his "earning capacity continues to be $21,833 per month." The appellate record, discussed at length in the factual and procedural background, *ante*, supports the court's findings. The court properly relied on *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, in which the Court of Appeal explained that "[a] parent does not ' " 'have the right to divest himself [or herself] of his [or her] earning ability at the expense of . . . minor children.' " ' [Citation.] When a parent decides not to seek employment to

25

the best of his or her ability, the court must retain discretion to impute income—otherwise 'one parent by a unilateral decision could eliminate his or her own responsibility to contribute to the support of the child[ren] . . . .' " (*Id.* at p. 1339; accord, *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375, 1391.) "'Each parent should pay for the support of the children according to his or her ability'" (*In re Marriage of LaBass & Munsee*, at p. 1337, italics omitted) because "both parents are equally responsible for the support of their children." (*Id.* at p. 1340; accord, *In re Marriage of Mosley*, at p. 1391.)

IV. *CHILD SUPPORT ARREARS*

Thomas also claims the court abused its discretion in calculating child support arrears. Specifically, he contends the court "patently abused its discretion in finding any [child support] arrears owed, given its own findings on payments made and child support owed" during the period from February 2011 through August 2011. We reject this contention.

As Thomas essentially repeats the arguments he asserted in his unsuccessful motion to correct claimed clerical errors in the court's final statement of decision, we shall begin with a discussion of that motion and the court's ruling.

A. *Background*

1. *Thomas's motion*

In his motion Thomas sought correction under Code of Civil Procedure section 473 , subdivision (d) of claimed "clerical, mathematical errors" in the court's final statement of decision. Specifically, he claimed the court "made a mathematical error in the calculation of the child support arrears" when it (1) found he owed $4,911 in new

26

child support arrears for the period from February 2011 (the month after the court denied his first motion to modify support) through August 2011, and (2) ordered him to pay a total of $20,145 in child support arrears (consisting of $15,234 in existing arrears plus the $4,911 in new arrears).

In support of this claim, Thomas noted the court had found that (1) he owed Jennifer $15,234 in existing child support arrears for the period from November 2010 through January 2011, and (2) he had paid Jennifer a total of $52,596 for the period from February 2011 through August 2011.  Thomas asserted that for the latter period he owed additional child support in the amount of $35,045 "calculated at four months of child support at $5,078[] per month (February 2011 through May 2011) and three months of child support at $4,911[] per month (June 2011 through August 2011)."

Noting that the court had stated in the final statement of decision that it was "appl[ying] [Thomas's] payments to [Jennifer] first to child support," Thomas then asserted (as he does on appeal) that—for the period from February through August 2011—he "actually overpaid [Jennifer] the sum of $17,551[] in child support" for that period, which he calculated by subtracting $35,045 (the amount of child support he owed for that period) from $52,596 (the total payments he made to Jennifer during that period)

Last, Thomas claimed (as he also does on appeal) that the court "should have applied this [$17,551 child support] overpayment to the finding of $15,234 in [existing child] support arrears, resulting in a payment in full of the support arrears and a further credit to [him] of $2,317[] in support overpayments" for February 2011 through August 2011.  He asserted the court should have applied this $2,317 child support overpayment

27

to the $15,000 in attorney fees he was required to pay to Jennifer under the judgment, "leaving a balance owing on the attorney fees contribution of $12,683[]."

2. *Jennifer's opposition*

In her opposition, Jennifer argued that Thomas was improperly asking the court to "*materially alter* the . . . Final Statement of Decision" and "revise its deliberately exercised judicial discretion," not correct a clerical error, by "modify[ing] its mathematical calculations such that every penny he paid to [her] between February and August 2011 is credited only toward past, present and future child support." She asserted that the evidence presented during the three days of hearings on Thomas's second motion to modify support and the court's final statement of decision established that "the payments Thomas made to [her] during [that period] constituted not only child support, but also payment toward [her] share of the proceeds from the sale of a community asset[12]─a payment Thomas was obligated to make pursuant to prior and existing court orders." Citing *In re Candelario* (1970) 3 Cal.3d 702, Jennifer argued that here any error was "an error made in rendering the judgment, and not an error made in recording it"; and, thus, Thomas's "backdoor attempt to modify the Court's ruling must be denied."

3. *Hearing and ruling*

The court held a hearing on Thomas's motion and following oral arguments took the matter under submission. The court denied the motion without explanation later that day.

---

12    Jennifer was referring to the sale of the software module (discussed, *ante*).

B. *Applicable Legal Principles*

In proper circumstances, a trial court may correct clerical errors appearing in a minute order that contains findings following a bench trial. (*Bell v. Farmers Ins. Exchange* (2006) 135 Cal.App.4th 1138, 1144 ["It is elementary that '[a] court can always correct a clerical, as distinguished from a judicial error which appears on the face of a decree by a *nunc pro tunc* order.' "]; *In re Candelario*, *supra*, 3 Cal.3d at p. 705 ["It is not open to question that a court has the inherent power to correct clerical errors in its records so as to make these records reflect the true facts."].)

"Clerical error, however, is to be distinguished from judicial error which cannot be corrected by amendment." (*In re Candelario*, *supra*, 3 Cal.3d at p. 705.) Clerical error refers to inadvertent errors in entering or "'recording the judgment rendered.'" (*Ibid.*) A judicial error, by contrast, "which cannot be corrected by amendment" (*ibid.*) under Code of Civil Procedure section 473, subdivision (d), occurs when "'the error was made in rendering the judgment.'" (*In re Candelario, supra,* at p. 705.)

"If the court misconstrued the evidence before it, or misapplied the law applicable to the facts disclosed by the evidence, or was even misled by counsel, such an error was in no sense a clerical error which could thereafter be corrected by the court upon its own motion . . . ." (*Lankton v. Superior Court* (1936) 5 Cal.2d 694, 696.) "Any attempt by a court, under the guise of correcting clerical error, to 'revise its deliberately exercised judicial discretion' is not permitted." (*In re Candelario*, *supra*, 3 Cal.3d at p. 705.)

29

C. *Analysis*

In essence, Thomas claims the court abused its discretion by not considering the *entire* amount of the $52,596 in total payments he made during February through August 2011 to be payments for child support. However, for that period the court, in the exercise of its discretion, had ordered Thomas to make payments in specified amounts for child support, child support arrears, *and* Jennifer's share of the proceeds of Thomas's sale of the software module. Although Jennifer has not responded to this appeal, she correctly argued below in opposition to Thomas's motion that he was improperly asking the court to "revise its deliberately exercised judicial discretion," not correct a clerical error, by modifying its mathematical calculations so that the *entire* amount of the $52,596 in total payments he made during February through August 2011 would be "credited only toward *past, present and future child support*" (italics added). (See *In re Candelario*, *supra*, 3 Cal.3d at p. 705.) We conclude Thomas has failed to meet his burden of showing the court abused its discretion.

## V. *FAILURE TO DEDUCT $10,000 FROM THE MONTHLY $20,800 IN GROSS SOFTWARE MODULE SALE PROCEEDS*

Next, Thomas contends the court abused its discretion when it found that "the gross software sales proceeds total $20,800 per month." Specifically, citing Section 2.5 of the APA, he contends the court abused its discretion in not deducting $10,000 from the monthly $20,800 in gross software sales proceeds. This contention is unavailing.

As we have already discussed, the section 2.5 of the APA provided that if Thomas quit or LBF Travel terminated his consulting services with or without cause prior to the

30

end of the specified consulting period, the monthly installment of $20,800 "for each full month remaining in the Consulting Period at the time of such termination *shall be reduced by* [*$10,000*] . . . ." (italics added).

Although Thomas's contention is not entirely clear, he appears to be claiming that $10,000 of each monthly payment of $20,800 should be treated as gross monthly consulting income, not gross proceeds from his sale of the software module. However, we have already concluded the $10,000 is not consulting income.

## VI.  *IMPOSITION OF ATTORNEY FEES AND SANCTIONS*

Last, Thomas contends the court abused its discretion in the imposition of sanctions and attorney fees.  We reject this contention.

Pursuant to Family Code sections 2030 and 2032, the court ordered Thomas to "contribute $25,000 toward [Jennifer's] attorney fees and costs."  Pursuant to Family Code section 271, it ordered Thomas to pay an additional $10,000 in attorney fees and costs "as a sanction."  The court also ordered that Thomas pay "[t]he combined award of $35,000" in monthly installments of $1,500 beginning on February 15, 2012.  In support of these orders, as Thomas points out, the court found Thomas's "conduct in failing to comply with existing orders, failing to honor the terms of the [Stipulation], and his derogatory references to [Jennifer] and/or her attorney, increased the cost of litigation thereby justifying an award of attorney fees and costs as a sanction."  The court also found "there is a disparity of income between the parties" and Thomas "has the ability to pay the award of attorney fees."

31

Thomas concedes he failed to comply with the terms of the Stipulation. The record amply supports the court's finding that Thomas "increased the cost of litigation." As we have discussed, in bringing his second motion to modify support, which the court denied, he utterly failed to show any material change in circumstances affecting his income and ability to pay support since the last child and spousal support orders issued by the court, as he was required to do. (See *In re Marriage of McCann*, *supra*, 41 Cal.App.4th at p. 983; *In re Marriage of Cryer*, *supra*, 198 Cal.App.4th at p. 1054.) Jennifer's request for an award of attorney fees and costs was supported by the declaration of her counsel. Accordingly, we reject Thomas's contention that the court abused its discretion by ordering him to pay attorney fees, costs, and sanctions.

## DISPOSITION

The order of the trial court is affirmed. Costs on appeal to Jennifer.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

McINTYRE, J.

32